# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------ * -----------------

UNITED STATES OF AMERICA,

*- against -*

MOHAMMED SALEH,

*Defendant,*

## Docket No: 1:93-cr-00181

## MEMORANDUM OF LAW

Kathy Manley
*Attorney for Mohammed Saleh*
26 Dinmore Road
Selkirk, New York 12158
518-635-4005
Mkathy1296@gmail.com

## *TABLE OF CONTENTS*

**Page**

TABLE OF AUTHORITIES...................................................................................... ii

INTRODUCTION................................................................................................ 2

JURISDICTION AND AUTHORITY TO ACT....................................................... 2

ELIGIBILITY FOR RELEASE.............................................................................. 3

THE UNDERLYING CASE.................................................................................. 3

PLEA OFFER AND ULTIMATE SENTENCE…………………………………………… 5

MR. SALEH WOULD RECEIVE A LOWER SENTENCE WERE HE TO BE
SENTENCED TODAY.......................................................................................... 6

  POINT I  MR. SALEH SHOULD BE GRANTED COMPASSIONATE
        RELEASE BECAUSE HE HAS SERVED MORE TIME THAN
        HE WOULD BE SENTENCED TO UNDER CURRENT LAW…….. 9

  POINT II  THE RISK POSED BY COVID-19 IS AN ADDITIONAL
        REASON TO REDUCE MOHAMMED SALEH'S SENTENCE
        TO TIME SERVED…………………………………………………… 11

  POINT III  MR. SALEH IS ALSO ELIGIBLE FOR RELEASE BASED ON
        HIS EXTENSIVE REHABILITATION AND HIS UNUSUALLY
        LENGTHY SENTENCE………………………………………………… 16

  POINT IV  MR. SALEH POSES NO RISK TO ANYONE'S SAFETY………… 19

  POINT V  THE 18 USC 3553(a) FACTORS SUPPORT RELEASE……………. 20

CONCLUSION.................................................................................................... 25

TABLE OF AUTHORITIES

**Page**

**Cases:**

*United States v. Abraham*, (SDFL 1:06-cr-20373) ………………………………….    9

*United States v. Aref*, 2007 U.S. Dist. LEXIS 17919 (NDNY 2007)…………………..    8

*United States v. Asaro*, 2020 US Dist. LEXIS 68044 (April 17, 2020)………………..    15

*United States v. Bellamy*, 2019 US Dist. LEXIS 124219 (DMN 2019)……………….    25

*United States v. Burson Augustine*, (SDFL 1:06-cr-20373)……………………………    9

*United States v. Rothschild Augustine*, SDFL 1:06-cr-20373)…………………………    9

*United States v. Bess*, 2020 U.S. Dist. LEXIS 70125 (WDNY April 22, 2020)……….    14

*United States v. Booker*, 543 US 220 (2005) …………………………………………..    6, 7, 8

*United States v. Bryant,* 2020 US Dist. LEXIS 75681 (D MD 2020)…………………..    10

*United States v. Campagna*, 2020 US Dist. LEXIS 54401 (SDNY March 27, 2020)……    14

*Untied States v. Cantu-Rivera*, 2019 US Dist. LEXIS 105271 (SDTX 2019)……………    16

*United States v. Coles*, 2020 U.S. Dist. LEXIS 72327 (CDIL Apr. 24, 2020)……………    14

*United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020)…………..……    1

*United States v Curtis,* 2020 U.S. Dist. LEXIS 70804 (DDC April 22, 2020)……………    14

*United States v. Ebbers*, 2020 US Dist. LEXIS 3746 (SDNY 2020)………………………    3

*United States v. Etzel*, 2020 US Dist. LEXIS 77198 (DOR May 1, 2020)    14

*United States v. Gentille*, 2020 WL 1814158 (SDNY April 9, 2020)……………………    15

*United States v. Gileno*, 2020 US Dist. LEXIS 67729 (DCT April 17, 2020)……………    15

*United States v. Gorai*, 2020 US Dist. LEXIS 72893 (DNV April 24, 2020)……………    12, 14

*United States v. Hammond*, 2020 US Dist. LEXIS 67331 (DDC April 16, 2020)………..    3, 15

*United States v. Hammoud*, 483 Fed Appx 865 (4th Cir. 2012)…………………………..    8

*United States v. Hansen*, 2020 US Dist. LEXIS 61946 (EDNY April 8, 2020)………….    15

*United States v. Haynes*, 2020 US Dist. LEXIS 71021 (EDNY 2020)……………………    2, 10

*United States v. Kurti*, 427 F.3d 159 (2nd Cir. 2005)…………………………………………    8

*United States v. Marks*, 2020 US Dist. LEXIS 68828 (WDNY 2020) ……………………    10

*United States v. Maumau*, 2020 US Dist. LEXIS 28392 (D UT February 18, 2020)………    10, 11

*United States v. McCarthy*, 2020 US Dist. LEXIS 61759 (SDNY April 8, 2020)………......    14

*United States v. Mehanna* (DMA 1:09-cr-10017) …………………………………………..    9

*United States v. Millan,* 2020 US Dist. LEXIS 59955 (SDNY 2020)……………………    16, 17

*United States v. O'Bryan*, 2020 US Dist. LEXIS 29747 (DKS February 21, 2020)…………    10

*United States v. Park*, 2020 U.S. Dist. LEXIS 73048 (SDNY Apr. 24, 2020)    14

*United States v. Rahman*, 189 F.3d 88 (2nd Cir. 1999)……………………………………    7

*United States v. Redd*, 2020 US Dist. LEXIS 45971 (EDVA 2020)    10, 11, 20

*United States v. Samana*, (CDCA 8:05-cr-00214)…………………………………………    8

*United States v. Sanchez,* 020 U.S. Dist. LEXIS 70802 (DCT April 22, 2020)…………..    14

*United States v Sawicz*, 2020 US Dist LEXIS 64418 (EDNY April 10, 2020)……………    15

*United States v. Scparta*, 18-cr-578 (SDNY April 19, 2020)………………………………...    15

*United States v. Smith*, 2020 US Dist. LEXIS 64371 (SDNY April 13, 2020)……………    15

*United States v. Resnick*, 2020 US Dist. LEXIS 59091 (SDNY April 2, 2020)………….    15

*United States v. Russo*, 2020 US Dist. LEXIS 65390 (SDNY April 14, 2020)…………..    15

*United States v. Thavaraja*, 740 F.3d 253 (2nd Cir. 2014)………………………………...    8, 20

United States v. *Thorson*, 2020 U.S. Dist. LEXIS 72595 (WDKY Apr. 24, 2020)……….    14

*United States v. Urkevich*, 2019 US Dist. LEXIS 197408 (D NE 2019)…………………..    10

iii

*United States v. Williams*, 2020 US Dist. LEXIS 63824 (NDFL April 1, 2020)…………..    15

*United States v. Young*, 2020 US Dist. LEXIS 37395 (MDTN 2020) ……………………..    10

*United States v. Yousry,* 590 F.3d 93 (2nd Cir. 2009)…………………………………………    9

*United States v. Zukerman*, 2020 US Dist. LEXIS 59588 (SDNY April 3, 2020)………….    14

**Statues and Regulations:**

18 USC 3142(g) ……………………………………………………………………………….    3, 19

18 USC 3553(a)……………………………………………………………………………….    2, 3, 20

18 U.S.C. 3582(c)(1)(A)(i) …………………………………………………………..    1, 9, 16, 20, 25

USSG 5G1.2(d) …………………………………………………………………………….....    6, 8

18 USSG Appx 1B1.13……………………………………………………………………………    3, 9, 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**UNITED STATES OF AMERICA**

                                **No. 1:93-cr-00181**

    v.

                                **MEMORANDUM OF LAW**

**MOHAMMED SALEH,**

            Defendant.

---

### DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE
### BASED ON EXTRAORDINARY AND COMPELLING REASONS

Mohammed Saleh, by undersigned counsel, moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, for a modification of his sentence based on extraordinary and compelling reasons, which include his high risk from COVID-19 based on advanced age and debilitating illness; the fact that he would receive a lower sentence were he to be sentenced today; and his extensive rehabilitation.

The current COVID-19 epidemic poses an extraordinary and compelling reason to release Mr. Saleh, in addition to the already-existing reason based on the fact that he would have gotten a much lower sentence under the current sentencing regime. As noted below, as stated in *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020), on March 19, 2020, the House Judiciary Committee urged that all existing authority be utilized to reduce the number of people in federal prisons, especially those who have health conditions putting them at high risk from the virus. Since that time, many courts have granted compassionate release for that reason.

The virus is already spreading in many federal prisons - soon it may be too late for Mr. Saleh. See https://www.bop.gov/coronavirus/. There were 57 cases on April 1, and as of May 11, there are **3379** cases where inmates have tested positive for the virus in federal prisons. The

1

number is probably much higher, as little testing has been done. Mr. Saleh is nearly 65 years old (he turns 65 on August 1, 2020) and suffers from several chronic medical conditions, including colon disease and breathing problems, which put him at particular risk from the virus.

He has already served more than 75 % of his sentence – he has served about 27 years of his 35 year sentence, and has a little over three years left – he is due to be released on 9/3/2023.

**Introduction**

Mr. Saleh has been incarcerated in connection with this case since June, 1993.  He is nearly 65 years old, and suffers from conditions which put him at increased risk from COVID-19. According to Dr. Brie Williams, the risk of exposure to COVID-19 is extremely high in the prison environment, where it is impossible to practice social distancing. (See Affidavit of Dr. Brie Williams, attached as Exhibit "A," at 2-3.)

Also, significantly, as discussed below, were Mr. Saleh to be sentenced today, he would almost certainly receive a much lower sentence. This has been a reason for granting several compassionate release motions, as discussed in more detail below. See, i.e. *United States v. Haynes*, 2020 US Dist. LEXIS 71021 (EDNY 2020) (sentence reduced from 46 years to 27 years time served because he would have received a shorter sentence under current law.)

Moreover, as discussed below, Mr. Saleh is remorseful, has engaged in extensive rehabilitation – he does not pose a danger to anyone's safety, and the 18 USC 3553(a) factors also support a reduction in sentence.

**Jurisdiction and Authority to Act**

Mr. Saleh is presently incarcerated, under BOP Register Number 34853-054, at FCI Beckley. He submitted a request for compassionate release to the warden on March 28, 2020, and it was denied on April 7, 2020. Mr. Saleh's Application is attached at Exhibit "B".) As it has

been 30 days since the Application was received, Mr. Saleh has exhausted his administrative

remedies under 18 USC 3582(c)(1)(a), which provides that the court may act 30 days after the

warden receives the application. *United States v. Hammond*, 2020 US Dist. LEXIS 67331 (DDC

April 16, 2020.)

**Mr. Saleh is Eligible for Release Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, and the Criteria Set Forth in USSG 1B1.13**

The governing statute directs the Court to first determine if there are "extraordinary and

compelling reasons" consistent with policy Statements by the Sentencing Commission; to

determine whether the defendant poses a "danger to the safety of any other person or the

community" as set forth in 18 USC 3142(g); and finally to grant the motion if the factors set

forth in section 3553(a) do not require its denial. 18 USC 3582(c); 18 USSG Appx 1B1.13;

*United States v. Ebbers*, 2020 US Dist. LEXIS 3746 (SDNY 2020.)

Because of the high risk COVID-19 poses to him, it is submitted that Mr. Saleh is eligible

for sentence modification based on Other Extraordinary and Compelling Reasons [here, COVID-

19]). USSG 1B1.13 Application Note 1(D.) In addition, he is eligible under Application Note

1(D) because were he to be sentenced today, he would receive a shorter sentence. Relevant

caselaw granting relief under Application Note 1(D) is discussed below.

As also discussed below, Mr. Saleh faces deportation upon release, and poses no safety

risk to anyone. Moreover, the 3553(a) factors support release, as set forth in more detail below.

**The Underlying Case**

Mohammed Saleh was one of several targets of a sting operation where a very troubled

informant, Emad Salem, was paid over a million dollars to set up Omar Abdel Rahman and

others based on suspicions that Rahman was promoting an extremist group. Mr. Saleh was not

involved with this group or any similar organization, but he ended up being convicted of

3

Seditious Conspiracy; Bombing Conspiracy; and Attempted Bombing. Judge Michael Mukasey imposed an aggregate sentence of 35 years in 1995.

Mohammed Saleh owned two gas stations in Yonkers, NY. On June 4, 1993, the informant and co-defendant Siddiq Ali came to one of those gas stations and spoke to Mr. Saleh, asking for financial support for some sort of jihadist attack. Mr. Saleh did not make any commitment to provide support, saying only, "God willing, I shall press my capabilities." (PSR, at Paragraph 103) He did witness Salem eat a piece of paper which allegedly contained targets of an attack, but he never came forward with financial support for any attack.

Then, on June 22, 1993, Mr. Saleh agreed, over the phone, in a confusing conversation, to sell $140 worth of diesel fuel to Siddig Ali and Amir Abdelgani.  One day later, on June 23, 1993 he sold Amir and his brother another $151 worth of diesel fuel.  He expected to be paid, and sold the fuel as he would sell fuel to any buyer. (The PSR verifies, in Paragraph 134, that this was a sale not a donation.)

While he may have suspected that the fuel was to be used in connection with some sort of attack, there was no evidence (beyond the June 4 conversation) that anyone told Mr. Saleh what the diesel fuel was to be used for.  Salem acknowledged this (Trial Transcript p. 17432-3; 17435). At no place in the PSR is it indicated that he knew what the fuel would be used for. It appears that Ali and Abdelgani and others did not trust Mr. Saleh with their plan and among themselves made statements indicating that they believed he was not part of the conspiracy. (Trial Transcript, at 17465-7)

Mr. Saleh was arrested the next day, June 24, 1993 and accused of being part of a conspiracy with more than 14 other defendants, most of whom he had never met before.

4

The government alleged that the "God willing" statement established the agreement for the conspiracy, and the sale of the diesel fuel was the overt act in furtherance of the conspiracy. And based on the scant evidence cited above, the jury convicted Mr. Saleh of Seditious Conspiracy, Bombing Conspiracy, and Attempted Bombing. It is submitted that the jury, which convicted all 10 of the defendants who went to trial, was overwhelmed by fear based on statements and actions by some of the co-defendants who did not even know Mr. Saleh. In other words, there was a great deal of spillover prejudice which caused the jury to speculate on the gaps in the evidence and convict Mr. Saleh.

After his arrest, when Mr. Saleh learned what he was accused of, he panicked. He denied having sold the fuel, and called an employee at his gas station and told him to destroy the receipts for the diesel fuel sales.

While Mr. Saleh's role in the conspiracy was claimed to be a financier (Trial Transcript, p. 7382) he, despite having been asked for money, never agreed to provide any money, and never provided any money or anything other than selling the above-mentioned diesel fuel.

**Plea Offer & Ultimate Sentence**

After Mr. Saleh's arrest he was offered a *5 year plea deal*, but his lawyer told him he shouldn't take it because he would almost certainly be acquitted. He was ultimately sentenced to *35 years.* It is noted that two co-defendants who did take plea offers, Earl Gant (who pled guilty to a bombing conspiracy) and Abdo Mohammed Haggag, were sentenced in 1996 to time served (approximately three years.) (Docket Sheet for SDNY 1:01-cv-00169) Another co-defendant who took a plea offer, Mohammed Abouhalima, was sentenced to 96 months.

Of the ten defendants who went to trial, two (Nosair and Rahman) were sentenced to life, and three others (Hampton-El, Elhassan and Alvarez) received the same 35 year (420 month)

5

sentence as Mohammed Saleh. The remaining five co-defendants, including several, such as Siddig Ali, who were much more involved in the conspiracy than Mr. Saleh, received *lower sentences* than his 420 months: Elgabrowny – 396 months; Siddig Ali – *only 132 months*; Amir Abdelgani – 360 months; Fares Khallafalla – 360 months; and Fadil Abdelgani – 300 months.

Mr. Saleh has *no prior convictions or any history of violence;* he has no connections to any violent groups; and he has an excellent institutional history, as described below.

**Mr. Saleh Would Almost Certainly Receive a Lower Sentence Were He to Be Sentenced Today**

Mohammed Saleh's sentence resulted from a perfect storm of factors: first, because there was no guideline for Seditious Conspiracy (which carries a statutory maximum sentence of 20 years) the court in a controversial decision, decided, pursuant to USSG 2X5.1, to apply the guideline for Treason (with a statutory maximum of life, or death), which has a base guideline range of 43, and a corresponding sentencing range of 30 years to life.

Then the court, believing that this was *mandatory* in the pre-*Booker* era, utilized USSG 5G1.2(d) to run the statutory maximum sentences consecutively: 20 years of Count One (Seditious Conspiracy); 5 years for Count Five (Bombing Conspiracy); and 10 years for Count Six (Attempted Bombing) to arrive at the 35 year aggregate sentence. This occurred despite the fact that *Counts Five and Six involved the same conduct as Count 1*.

**Booker and USSG 5G1.2(d)**

Before the Supreme Court's decision in *United States v. Booker*, 543 US 220 (2005), the sentencing guidelines were mandatory. USSG 5G1.2(d) provides that whenever the count with the highest statutory maximum sentence is lower than the guidelines range, sentences *shall* be imposed consecutively in order to reach that guidelines range. Thus the trial court herein believed that because the guidelines range (using the problematic guideline for Treason) was

higher than the 20 year statutory maximum for Seditious Conspiracy, he was *obligated* to run the sentences consecutively to reach the 30 year to life range.

Significantly, in the appeal decision herein, the Second Circuit found Mohammed Saleh's sentence "*especially troubling*," but upheld it, essentially *because of the mandatory nature of the guidelines* at the time. The Court stated:

" ...[T]he key link in his sentence calculations was his use of the treason analogy ... to set the defendants' base offense level for Count One (seditious conspiracy) at 43... It was that level 43 (or the adjusted levels close to it) that provided the target toward which the cumulation of sentence on other counts could then reach. Though Judge Mukasey *emphasized that the defendants 'are not being punished for treason*,' ... *the Guidelines' prescribed offense level (and consequent punishment) for treason by waging war was in fact a major determinant of their ultimate sentence*s.

*What makes the defendants' point **especially troubling** is that some of the other counts that were available for **consecutive sentences** in order to approach the treason offense levels – Count Five (overall bombing conspiracy) and Count Six (Spring 1993 attempted bombing) and perhaps others – **involved conduct that was part of the seditious conspiracy**.* Though the offenses charged in Counts Five and Six are not lesser included within the offense charges in Count One...*they were nevertheless used to enhance the punishment for Count One above the statutory maximum for that count.* The Guidelines themselves normally seek to preclude that result by sensibly requiring that certain related offenses be grouped so that the convictions for these offenses do not increase the sentence on the most serious offense within the group. ... *But the limitation that normally results from grouping was overridden in this case **by the combination of assigning a treason offense level** to the Count One offense and **then applying the consecutive sentence provisions of section 5G1.2(d)** to all counts, including Counts Five and Six.*
\*\*\*
...[T]he *Guidelines prescribe* a precise regime for the decision as to consecutiveness of terms imposed on multiple counts. ... If the total punishment called for by the Guidelines exceeds the statutory maximum for the count carrying the highest maximum, the judge imposes consecutive sentences...

In our case, Judge Mukasey faithfully applied section 5G1.2..." *United States v. Rahman*, 189 F.3d 88, at 151,155, emphasis supplied (2nd Cir. 1999)

After *Booker*, which did *not* apply retroactively to cases such as this one where the direct appeals were final (see *Saleh v. U.S.*, 1:01-cv-00169, 9/23/05), many cases were remanded and many resulted in lower sentences, several of which involved the erroneously mandatory

application of USSG 5G1.2. For example, in *United States v. Kurti*, 427 F.3d 159, 164 [emphasis supplied] (2nd Cir. 2005), the court stated, "*As a result of United States v. Booker... 5G1.2(d) of the Sentencing Guidelines is advisory*. The parties agree that ... the matter should be remanded for resentencing."

As another example, in *United States v. Hammoud*, 483 Fed Appx 865 (4th Cir. 2012), the court upheld a sentence which had been reduced from 155 years to 30 years after a *Booker* remand based on the erroneously mandatory application of 5G1.2(d).

Therefore, although Mr. Saleh could not obtain a *Booker* remand because his case was final when *Booker* was decided, it is submitted that *were he to be sentenced today, the court would almost certainly not run the sentences consecutively and he would receive a sentence of at most 20 years* (the statutory maximum on the top count) which he has already served.

**Terrorism-Related Cases with Significantly Lower Sentences**

In many more recent terrorism-related cases defendants have received much lower sentences than Mr. Saleh, for much more egregious acts than his. In *United States v. Thavaraja*, 740 F.3d 253 (2nd Cir. 2014), the Second Circuit upheld a 108 month sentence for the "principal procurement officer" of the Tamil Tigers (Liberation Tigers of Tamil Eelam or LTTE), a designated terrorist organization which carried out many acts of violence in Sri Lanka, against both military personnel and civilians.

In addition, all of the following defendants were convicted long after Mohammed Saleh and all have been released*: United States v. Hammad Samana*, (CDCA 8:05-cr-00214) (*70 month sentence for man convicted of conspiracy to wage war against the United States under 18 USC 2384*); *United States v. Yassin Aref*, 2007 U.S. Dist. LEXIS 17919 (NDNY 2007); (180 month sentences imposed *after trial* for material support to a terrorist plot in New York City –

8

the Guidelines range was 30 years to life and the judge cited *Booker*); *United States v. Tarek Mehanna* (DMA 1:09-cr-10017) (210 month sentence for man convicted *after trial* of material support to Al Qaeda); *United States v. Burson Augustine*, (SDFL 1:06-cr-20373) (72 month sentence *after trial* in material support conspiracy); *United States v. Abraham*, (SDFL 1:06-cr-20373) (112 month sentence *after trial* in material support conspiracy); *United States v. Rothschild Augustine*, SDFL 1:06-cr-20373) (84 month sentence *after trial* in material support conspiracy); *United States v. Mohammed Yousry,* 590 F.3d 93 (2nd Cir. 2009) (20 months for man convicted *after trial* of material support conspiracy); *United States v. Balraj Naida* (DMD 1:08-cr-00091) (57 months *after trial* in material support case.)

Therefore, because of the minor nature of Mohammed Saleh's role in the conspiracy (described above), the fact that under *Booker he would almost certainly have received at most 20 years*, and the fact that in the vast majority of more recent cases, similarly situated defendants have received far shorter sentences than the 420 month sentence imposed on him, Mr. Saleh has an extremely compelling case for compassionate release.

I.    **MR. SALEH SHOULD BE GRANTED COMPASSIONATE RELEASE BECAUSE HE HAS SERVED MORE TIME THAN HE WOULD BE SENTENCED TO UNDER CURRENT LAW**

Since the First Step Act went into effect in January, 2019, several courts have granted sentence reductions under 18 U.S.C. § 3582(c)(1)(A)(i), and USSG 1B1.13 Application Note 1(D) because if the defendants were to be sentenced today, they would receive lower sentences. These cases have tended to be based on the change in law with regard to consecutive sentences under 18 USC 924(c) but the same rationale applies herein because, as set forth above, Mr. Saleh *would almost certainly receive no more than 20 years were he to be sentenced today*. He has already served well more than that.

See: *United States v. Haynes*, 2020 US Dist. LEXIS 71021 (EDNY 2020) (sentence

reduced from 46 years to 27 years time served based on stacked 924(c) counts); *United States v.*

*O'Bryan*, 2020 US Dist. LEXIS 29747 (DKS February 21, 2020) (defendant released because his

924(c) count would now result in a much lower sentence – sentence reduced from 351 months to

171 months); *United States v. Maumau*, 2020 US Dist. LEXIS 28392 (D UT February 18, 2020)

(sentenced reduced from 55 years to 10 years because his 924(c) count would now result in a

much lower sentence); *United States v. Urkevich*, 2019 US Dist. LEXIS 197408 (D NE 2019)

(sentenced reduced from 848 months to 368 months based on current lower sentences under the

FSA); *United States v. Young*, 2020 US Dist. LEXIS 37395 (MDTN 2020) (granted reduced

sentence based on change in law for 924(c) counts)(after a hearing on 4-30-20 the sentence was

reduced to time served); *United States v. Redd*, 2020 US Dist. LEXIS 45971 (EDVA 2020);

*United States v. Marks*, 2020 US Dist. LEXIS 68828 (WDNY 2020) (sentence reduced from 40

years to 20 years based on stacking 924(c) counts); *United States v. Bryant,* 2020 US Dist.

LEXIS 75681 (D MD 2020) (sentence reduced from 637 months to 300 months time served due

to stacking 924(c) counts.)

In *United States v. Redd*, supra, the court greatly reduced the sentence from 603 months

to 243 months (time served) stating:

> "…Mr. Redd was sentenced (for four bank robberies and possession of guns in
> connection thereto) to a total of 603 months… consisting of 63 months for the robberies,
> the then pre-*Booker* mandatory sentence and 540 months … the then-applicable
> mandatory sentence imposed under 18 USC 924(c.) He began serving that sentence in
> 1997 at age 41 and now, at 64 years old, has served over 23 years. With good time
> credits, he will be released in 2040…
> ***
> …[T]his Court joins other courts in concluding that a court may find, independent
> of any motion, determination or recommendation by the BOP director, that extraordinary
> and compelling reasons exist …other than those set forth in USSG 1B1.13 cmt n. 1(A)-
> (C) and that the reasons it has determined in this case constitute extraordinary and

10

compelling reasons warranting a sentencing reduction satisfy any requirement for consistency with any applicable policy statement.
       ***
       Based on all these considerations, the Court concludes that a reduction to 15 years, from 45 years, is warranted as to Mr. Redd's three 924(c) convictions, and the Court will so reduce Mr. Redd's sentence." *Redd*, at 1, 18-19, 25

In *United States v. Maumau*, supra, where the sentence was reduced from 55 years to 10 years, the court similarly stated:

       "….[T]he court concludes that a combination of factors – Mr. Maumau's young age at the time of the sentence, the *incredible length of the mandatory sentence imposed, and the fact that, if sentenced today, he would not be subject to such a long term of imprisonment* – establish an extraordinary and compelling reason to reduce Mr. Maumau's sentence." *Maumau*, at 17, emphasis supplied.

Like Mr. Redd, Mr. Saleh is 64 years old, and, as in all the cases cited above, received a much longer sentence than would be imposed today. He has served more time than Mr. Redd, and Mr. Maumau, almost 27 years, and would almost certainly be sentenced to no more than 20 years were he to be sentenced today. As in *Redd, Maumau* and the other cases cited herein, this warrants a reduction of his sentence to time served.

## II.     THE RISK POSED BY COVID-19 IS AN ADDITIONAL REASON TO REDUCE MOHAMMED SALEH'S SENTENCE TO TIME SERVED

The risk posed to Mr. Saleh by COVID-19 is another reason to grant compassionate release herein, as has occurred in many recent cases.

**The COVID-19 Measures Taken by the Bureau of Prisons are Severely Inadequate**

Despite the best efforts of the BOP, this virus has been continuing to spread through more and more facilities, with a sharp rate of increase in the number of cases over time. See *Forbes,* "Federal Bureau of Prisons Institutions not Showing any Sign of Flattening Curve,". https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-of-prisons-institutions-not-showing-any-signs-of-flattening-curve/#6497965a54dd.   At Page 5, the article states, "More

11

inmates are sick than the BOP is reporting and more inmates are not reporting that they are sick out of fear of being identified as sick."

See below for a graph created by undersigned counsel, which tracks the *reported cases* each day.



Two recent *Chicago Sun Times* articles reported that the number of documented cases at Chicago MCC was higher than the numbers reported by BOP, and that after this was publicized the first time, BOP altered their numbers to reflect the reality on the ground.https://chicago.suntimes.com/coronavirus/2020/4/18/21225747/coronavirus-cases-rising-chicago-federal-jail See also https://www.chicagotribune.com/coronavirus/ct-coronavirus-mcc-chicago-response-20200429-e3crup5ifnatznwjm42fn7emre-story.html

On April 14, federal correctional officers at FCI Tallahassee filed an OSHA complaint, alleging that the BOP's failure to protect them from the virus put them in imminent danger. https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/

12

In addition to there being more *documented* cases than those reported by BOP, it is also clear that, as is true also in many other places, the true number of cases is much higher due to a lack of testing.

In *United States v. Gorai*, 2020 US Dist. LEXIS 72893 (DNV April 24, 2020), the court stated, at 6:

> "First, testing inside prisons has been scant except for people who self-report symptoms-which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (footnote citation omitted)."

By the end of April, 2700 inmates had been tested throughout the BOP system, and *70 % of them tested positive* for the virus. https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f

**Mr. Saleh's Medical Conditions and Age Put Him at Risk**

Mohammed Saleh is listed as "care level 2," which indicates chronic conditions, requiring at least quarterly clinical evaluations. (Exhibit "C" at 3) While we have not been able to obtain many of his medical records[1], it is noted that in the four years he has been at FCI Beckley, Mr. Saleh has had to be taken to hospitals or medical appointments more than fifteen times.

He is at risk for colon cancer and had to have a portion of his colon removed in 2018. (See Exhibit "C" at 6) In addition to problems with his knee, back and eye (a hole in the retina which requires outside appointments every three months), Mohammed Saleh suffers from some sort of asthma or lung disease which makes him short of breath. (See Exhibit "B" at 1-2) He was told this was due to the elevation of the prison, but as most inmates and staff do not have these symptoms, *there must be some underlying lung condition*. This puts him at risk for COVID-19.

---

[1] While it takes many months to obtain medical records via FOIA, it is submitted that, should it be necessary, the prosecution will likely be able to quickly obtain the records through BOP counsel – they can also be obtained via a judicial subpoena.

See Exhibit "A" at 4; and CDC Guidelines showing lung disease as a risk factor.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

Mr. Saleh's age (he turns 65 in less than 3 months) also puts him at risk according to the CDC[2].

Recently, federal courts have been granting compassionate release motions based on the risk posed to particular defendants by the COVID-19 virus. *United States v. Etzel*, 2020 US Dist. LEXIS 77198 (DOR May 1, 2020); *United States v. Gorai*, 2020 US Dist. LEXIS 72893 (DNV April 24, 2020) (man sentenced to 57 months in 2019 granted compassionate release; was high-risk due to asthma); *United States v. Coles*, 2020 U.S. Dist. LEXIS 72327 (CDIL Apr. 24, 2020) (48 year-old granted due to hypertension); *United States v. Thorson*, 2020 U.S. Dist. LEXIS 72595 (WDKY Apr. 24, 2020); *United States v. Park*, 2020 U.S. Dist. LEXIS 73048 (SDNY Apr. 24, 2020) (44 year-old with severe asthma and immune-compromising disease granted compassionate release despite egregious nature of offense); *United States v. Curtis*, 2020 U.S. Dist. LEXIS 70804 (DDC April 22, 2020) (man serving *life sentence* for sex-trafficking minors granted compassionate release based on extremely severe medical conditions); *United States v. Bess*, 2020 U.S. Dist. LEXIS 70125 (WDNY April 22, 2020) (64 year-old man sentenced to 84 months in 2019 granted compassionate release based on his serious medical conditions); *United States* v. *Sanchez*, 2020 U.S. Dist. LEXIS 70802 (DCT April 22, 2020) (high-risk due to lupus); *United States v. Campagna*, 2020 US Dist. LEXIS 54401 (SDNY March 27, 2020) (55 year old man with compromised immune system granted compassionate release); *United States v. Zukerman*, 2020 US Dist. LEXIS 59588 (SDNY April 3, 2020); *United States v. McCarthy*, 2020 US Dist. LEXIS 61759 (SDNY April 8, 2020) (65 year-old man with lengthy criminal history serving recent sentence for violent crime granted compassionate release based on COPD and

---

[2] While the CDC guidelines note an increased risk for those 65 or over, Dr. Williams' Affidavit shows that those in prison age faster than the community at large. (Exhibit "A" at 5)

asthma); *United States v. Hammond*, supra (77 year-old serving 355 month sentence granted compassionate release); *United States v. Scparta*, 18-cr-578 (SDNY April 19, 2020); *United States v. Kataev*, 2020 US Dist. LEXIS 65756 (SDNY April 14, 2020) (51 year-old with sinusitis granted compassionate release); *United States v. Resnick*, 2020 US Dist. LEXIS 59091 (SDNY April 2, 2020); *United States v. Smith*, 2020 US Dist. LEXIS 64371 (SDNY April 13, 2020) (at risk due to asthma); *United States v. Russo*, 2020 US Dist. LEXIS 65390 (SDNY April 14, 2020); *United States v. Gentille*, 2020 WL 1814158 (SDNY April 9, 2020); *United States v. Hansen*, 2020 US Dist. LEXIS 61946 (EDNY April 8, 2020); *United States v Sawicz*, 2020 US Dist LEXIS 64418 (EDNY April 10, 2020) (sex offender with hypertension granted compassionate release); *United States v. Asaro*, 2020 US Dist. LEXIS 68044 (April 17, 2020) (organized crime figure who committed violent crime at the age of 77 granted compassionate release); *United States v. Gileno*, 2020 US Dist. LEXIS 67729 (DCT April 17, 2020) (compassionate release based on chronic asthma); *United States v. Williams*, 2020 US Dist. LEXIS 63824 (NDFL April 1, 2020) (career offender serving life imprisonment for bank robbery released based on age and medical conditions.)

Several of the cases, including *Asaro, McCarthy*, *Williams,* and *Hammond*, involve lengthy sentences, not due to end any time soon, and they were all imposed for violent crimes. *Asaro* involved a high level organized crime figure who had lived a life of violence; *Williams* involved a life sentence for a violent crime and a long history of violence.

In contrast, Mr. Saleh is due to be released anyway in three years, and he has *no* criminal history, and no history of violence. Like the other defendants, he is at serious risk of dying from COVID-19 should he be exposed to it.

15

Several of the above cases involve BOP facilities, such as FCI Beckley, where there are no *current, reported* cases of COVID-19. The *Etzel* court recently stated, at 9:

> "Here, defendant has shown that he is particularly vulnerable to COVID-19. While there have been no identified cases of COVID-19 at FCI Sheridan, infection can spread with deadly speed. For example, some other BOP institutions, such as FCI Terminal Island have seen outbreaks grow into hundreds of confirmed cases in a matter of weeks. …"

Based on the foregoing, this Court should find that the combination of Mohammed Saleh's age and medical conditions put him at risk for COVID-19, and that this constitutes an extraordinary and compelling reason under 18 USC 3582(c)(1)(A.)

### III.    MR. SALEH IS ALSO ELIGIBLE FOR RELEASE BASED ON HIS EXTENSIVE REHABILITATION AND HIS UNUSUALLY LENGTHY SENTENCE

In *United States v. Millan,* 2020 US Dist. LEXIS 59955 (SDNY 2020) and *Untied States v. Cantu-Rivera*, 2019 US Dist. LEXIS 105271 (SDTX 2019), the courts granted sentence reductions under the First Step Act based on the defendants' extensive rehabilitation. In *Millan*, supra, where the 57 year-old defendant was serving a mandatory life sentence for engaging in a continuing criminal enterprise (drug trafficking) under 21 USC 848(b), the court stated:

> "Before the Court is Eric Millan's motion pursuant to 18 USC 3582(c)(1)(A) for an Order reducing his life sentence (of which he has already served more than 28 years) to time served. The Government opposed the motion… For the reasons that follow, the motion is granted.
> \*\*\*
> …Congress envisioned 18 USC 3582(c)(1)(A) as a 'safety valve[] for [the] modification of sentences'… [S. Rep. No. 98-225, at 121]…
> …[I]f a judge finds the existence of any 'extaordinary and compelling reasons' warranting a sentencing reduction, those reasons could … form the legal basis for the reduction of 'of an unusually long sentence.' Id. at 55-56…
> \*\*\*
> …In the almost three decades that have passed since he was arrested… Mr. Millan has done everything in his power to rehabilitate himself… …Mr. Millan has conducted himself as a model prisoner and demonstrated exceptional character…

16

Notwithstanding his circumstances and the harsh conditions of his confinement, Mr. Millan has maintained an extraordinarily positive outlook… Mr. Millan successfully completed dozens … of BOP … programs…

\*\*\*

…Simply put, Mr. Millan, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve himself to the utmost extent possible and was motivated to do so notwithstanding his circumstances. The Court *finds this to be an extraordinary and compelling circumstance*." *Millan*, supra, at 1, 16-17, 26-27, 30, emphasis supplied.

**Despite Extremely Harsh Conditions, Mr. Saleh has had Exemplary Conduct in Prison**

In connection with a case challenging his lengthy and unwarranted solitary confinement in the ADX, based only on the nature of his conviction, Mohammed Saleh met three attorneys, and they all wrote incredible letters in support of him. The letters are attached at Exhibit "D" and were first submitted in support of a 2016 Commutation Petition. (*Because of the need to file this motion quickly based on the risk of COVID-19, new letters have not been obtained*.) Very significantly, law professor Brittany Glidden stated:

"People are sent to the ADX for a variety of reasons and reacted in a variety of ways, often with anger or violence. Many (or most) have connections to dangerous groups or have prior violent incidents. *Mr. Saleh has neither, a situation that at times has left him vulnerable to attack from other prisoners*... Mr. Saleh just tried to take each day at a time and act the best he could. *Among many angry prisoners, he was always gracious, calm ...trying to make the best [of] a very hard time.* He didn't understand why he was at ADX (he was transferred along with many Muslim prisoners after 9-11, even though he didn't have any negative discipline history or any relationship to [those] events) and it didn't make sense to those of us who worked with him either. Rather than being hardened by prison, Mr. Saleh is warm, generous, and always tries to view his situation in the best possible light. He took every opportunity afforded to him to learn; *he was the only prisoner that I spoke with who said positive things about his programming on the tv) at ADX. ...*He has never displayed anything but impeccable character. ... Mr. Saleh has amazingly kept ... his role as parent and husband, and often discussed his parenting issues with us... [If he were not to live with his family] *I would happily have offered my home to him while he got back onto his feet.* That is how certain I feel about his future actions and the fact that he deserves a chance..." Exhibit "D," at 10-11, emphasis supplied.

17

Laura Rovner, Esq. Director of the Clinical Programs at the University of Denver College

of Law, stated:

"*...Mr. Saleh has done exceedingly hard time, and for reasons having nothing to do with his conduct.* Despite this, I have found Mr. Saleh to be unfailingly compassionate, gentle, and kind. It takes a person of extreme strength of character to retain these qualities after years in near-isolation. *That he did not allow himself to devolve into anger or resentment speaks more to his nature than anything I could describe…..*I also had the opportunity to review his BOP Central File, including his disciplinary history, program participation, program reviews, and progress reports, which illustrate the ways that Mr. Saleh has *used his time in prison to further his education and personal development.* While he had earned two Bachelor of Science degrees prior to his conviction, he continued to pursue educational opportunities once incarcerated. He completed a course to be a trained forklift operator. He has taken a number of classes toward a Masters degree. And while he was incarcerated at ADX, he completed approximately *100 educational courses.* He also learned how to crochet and to make jewelry. *Ever-generous and always thoughtful, Mr. Saleh has crocheted hats and scarves for the students who represented him, as well as for my family and me....*" (Exhibit "D," at 1-2)

A third law professor/lawyer, Nicole Godfrey, likewise wrote a letter in support of

Mohammed Saleh, noting the strong compassion and generosity he displays despite the harsh

conditions he has endured. She stated:

"...Mr. Saleh is a warm, loving person who has maintained strong ties with his family throughout his 22 years of incarceration, and I feel confident that he will live a peaceful, law abiding life with his family upon his release......[H]e is without fail, *one of the most compassionate clients I've ever had the opportunity to represent. ...* I learned that Mr. Saleh has continuously tried to use his time in prison to advance his education and personal development. ...Luckily for me, Mr. Saleh has a generous spirit, and I have been the proud recipient of hand-made gifts from him. While my representation of Mr. Saleh was not ultimately successful, he has remained eternally gracious, always remembering to check in on me and to wish me happy birthday. ...I had a hiking accident that left me severely injured... To this day, *I receive frequent emails from Mr. Saleh checking on how my recovery is going and worrying that I may continue to be in pain. This enduring kindness illustrate the loving, warm personality that Mr. Saleh has. It is this personality that has allowed him to maintain strong ties to family members, despite the enormous distance and hardship* that incarceration [causes]... Mr. Saleh speaks lovingly of his daughter and grandchildren, and he cherishes the moments he can spend with them... Mr. Saleh lights up with warmth whenever he speaks of his family, and I know they must feel the same way. *Mr. Saleh is a committed family man, who has served decades in prison, and undoubtedly stands ready to love a low-abiding life surrounded by his grandchildren.* … I am convinced that, if released, he would pose no risk to society. ..." Exhibit "D," at 15-16

18

Mr. Saleh's most recent Program Review (Exhibit "C" at 1-4) and his Custody Classification Form (Exhibit "C," at 5) are very positive. The Custody Classification Form notes no disciplinary reports (*he has had a clear disciplinary record for many years*) and notes that his security points are at the "low" level.  The Review notes that Mohammed Saleh is to be released in 2023, and documents the successful completion of well over 100 classes, (Exhibit C, at 1-3)

As can be seen from these records, and, especially, the letters from the three attorneys, Mohammed Saleh has, like the defendant in *Millan*, supra, completed dozens of programs, acted as a model prisoner, and maintained a positive outlook despite his very difficult circumstances.

Moreover, Mohammed is very remorseful, as shown by the letter from his daughter, Sanna, who says, "My father accepts full responsibility for his actions, and he tells me how much he regrets what he did. He is deeply remorseful because he knows that his crime could have had terrible consequences for others." (Exhibit "D," at 6) The letter from his former paralegal, Caroll Dudek, also discusses his remorse, stating, "He accepts responsibility for his crime and is profoundly remorseful. ... He knows he had a duty to protect others who would have been victimized, had the conspiracy been executed." (Exhibit "D" at 4) This rehabilitation is, as in *Millan* and *Cantu-Rivera*, another reason to grant compassionate release herein.

### IV.     MR. SALEH POSES NO RISK TO ANYONE'S SAFETY

USSG 1B1.13(2) states that the court must find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 USC 3142(g)." 18 USC 3142(g) contains three factors for the court to consider in this regard: "1) the nature and circumstances of the offense charged; 2) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, past

19

conduct, criminal history and drug and alcohol abuse; and 3) the nature and seriousness of the danger to any person or to the community that release would impose."

Mohammed Saleh has absolutely no criminal history, and no history of any violence. It is submitted that there was no evidence presented at trial, nor does any such evidence exist, that Mohammed Saleh was connected to any violent groups. To the contrary, as shown in the above letters in support of him, he is gentle, thoughtful, and compassionate.

In *United States v. Redd*, supra, at 23, the court stated:

> "…Mr. Redd does not constitute a danger to the safety of others or the community. …At age 64, he is statistically unlikely to recidivate, and while his criminal conduct involved a firearm, his limited prior criminal history did not involved violence, and his conduct during his more than 20 years in prison is overwhelmingly positive…"

Like Mr. Redd, Mr. Saleh is 64 years old, and his conduct over *27 years* in prison has been overwhelmingly positive. He has absolutely *no* criminal history, and this Court should find that he does not pose a danger to anyone's safety.

**Mr. Saleh Faces Deportation Upon His Release**

As Mohammed Saleh was not a US citizen, he faces deportation to Jordan upon his release from prison. As noted in *Thavaraja*, supra, this is a relevant factor in support of a lower sentence.

## V.    THE 18 USC 3553(a) FACTORS SUPPORT RELEASE

Consideration of the applicable factors from 18 U.S.C. § 3553(a), as also required by § 3582(c)(1)(A), leads to the conclusion that reduction at this time of Mr. Saleh's term of imprisonment to the time already served is warranted.

(a) The "characteristics of the defendant," § 3553(a)(1), now include his painful and incurable medical conditions, as well as his *high risk of dying from COVID-19 in prison*.

20

Mohammed Saleh is originally from Jordan, and he came to this country in 1977 to study Engineering, obtaining a Bachelor of Science in Civil Engineering from North Carolina State University at Raleigh and a Bachelor of Science in Chemistry from Shaw University, also in Raleigh. He married an American citizen and had two children, both of whom are now living and working in New York.

After he divorced, Mohammed returned to Jordan where he re-married and had three more children. He then returned to the US in order to spend time with his oldest two children, whom he missed very much. But their mother refused to let him see them and while his visitation case was pending in family court, he was charged in the instant case and was not able to see them anyway.

When his daughter Sanna was an adult, she was able to find her father and re-establish a relationship with him. This is one of the few bright spots in Mohammed's life. She wrote an incredible letter describing her story, explaining how her mother and step-father abused her and eventually rejected her altogether, refusing even to meet her young daughter, Brianna. In contrast, she says, "He is the only parent who loves me, cares about my life and is committed to me."  (Exhibit "D", at 5) Sadly, Sanna has been living in a shelter over the past year, and hasn't had the resources to travel to visit him in the last few years.

Sanna's letter states:

> "...My parents divorced when I was three or four... and from then on my mother refused to allow visitation. My dad was in negotiations to have custody when he was arrested in this case. *For all the years he was in prison, I was never given the letters, birthday cards and money he sent to my home.* People who tried to find me on his behalf were told that no one knew where I was... *I was 24 the first time I spoke to my father after I found him in prison. He is the only parent who loves me, cares about my life and is committed to me.* My mother sent me out of the house when I was young, when she remarried and had children with her new husband. ... My daughter and I have gone to her house but she refused to speak to us. ... My daughter, Brianna, and I have visited my dad

in Marion several times. ...[... *Since I found my father again, I know what it is to be loved by a parent who wants the best for me.*



Mohammed Saleh with Sanna and Brianna in a 2016 photo

...Because of him I've formed a loving relationship with my stepmother and step-siblings who live in Jordan. … My stepbrother, Abdul Rahman... came to the US to see our father for the first time since he was a baby. He lived with me and my daughter in our apartment and we drove across the country to see our dad... He cried and cried like a boy. .... ... He served very hard time and he has been punished enough. ... [H]is health has been deteriorating. ... He helps other prisoners, especially a man who is mentally ill, and another prisoner who was a soldier in Iraq depends on him for emotional support. …His life before prison was spent working hard for an education and developing two businesses. ... My father is a good person. *Please give him a chance to live the years he*

22

*has left surrounded by the family who loves him. ...*" Exhibit "D" at 5-6, emphasis supplied

Mr. Saleh has been rebuilding his relationship with his son, Abdulrahman as well. Mr. Saleh sees the pain his children experienced having grown up without their father, and he would like to make amends for the years he was missing from their lives. His health is getting worse each year, and he is afraid that he will not have a chance to spend time with them. Abdulrahman wrote a letter expressing how important family is to his father, and how much he and the rest of the family need his father, stating:

> "...Mohammed Saleh is my father. ... I [had] not seen him for 22 years and miss him. ..[F]amily is the most important part of his life. Our family lost all financial support when my father was imprisoned. My mother is getting older and has the responsibility of caring for [the] grandchildren, and she is very tired. My grandmother died while he was in prison. My father... was very responsible and intelligent, and earned two Bachelor Degrees... in engineering and science. ... His two businesses did well, and sometimes he worked 7 days a week, 13 hours a day... We phone and write to each other regularly. He is devoted to our family and we support him completely. ...He served the majority of his 35 year sentence, and has been punished enough. ... If my father is returned to society, we will give him the support, motivation, guidance and love he needs to have a productive, stable life. He has a home to live in with us. There is very good employment in Jordan for someone with his achievements. He is always very positive on the phone... ...I humbly ask you for compassion and [to] give him clemency..." Exhibit "D" at 17-18

Mohammed's wife, Laila, also wrote a letter, stating that Mohammed was her "pillar of strength," and that she is determined to survive until he comes home. She states:

> "My name is Laila Saleh and Mohammed Saleh is my husband. …Mohammed was my pillar of strength. He was always generous, kind and hardworking. Our family is the most important part of his life. ... Losing their father has been devastating for our children. They were 6, 5 and 1 years old. My daughter now has two babies of her own, but her marriage has been troubled. She is in treatment for severe depression and she is unable to care for the children. They live with me, and I have to be a mother again for them. ...It is very stressful, and I am tired most of the time and sick often. ... One of my sons was deeply disturbed by his father's imprisonment, and as a teenager he was on a path that was unhealthy and destructive. My other son was very much in love with a college girl... They decided to marry, but her family refused to allow it because my husband is in prison. My son's heart is broken. ... I am determined to survive until Mohammed comes home. We pray for each other and are intimately involved with each other's lives. His children deserve to reunite with him. ..." (Exhibit "D" at 13-14)

23

Finally, Mohammed's good friend, Carol Dudek, wrote about how she met him when she was a paralegal for a codefendant, and why he strongly deserves clemency, stating:

"*I have known Mohammed Saleh since 1993 when I was appointed under the Criminal Justice Act as a Paralegal for a co-defendant.* I was very cautious, remembering the first bombing at the World Trade Center, in sight of where I live. My husband regularly drove through the Lincoln Tunnel or work and *I had misgivings about being on the defense team. ...For 18 months, my job was to be locked up with our client, with Mohammed and other defendants, often the only woman in the room. He was always considerate, gentlemanly and kind. Over all this time, Mohammed and I have become friends and I know what kind of person he is.* We regularly write and talk on the phone.... …*We all on the defense team were stunned by the verdict and the sentence, particularly in Mohammed's case,* because within the realm of the conspiracy, his role was so minor that *everyone believed his sentence would be minimal.* Mohammed should have pleaded guilty... Three co-defendants submitted guilty pleas and were released after ... minimal time... a fourth was released, and a fifth was re-sentenced [to minimal time.]..... Mohammed has not seen his wife in all these years, or his other son, or daughter, who is severely depressed... They all live in Jordan. …Mohammed has served the majority of his sentence, 22 years. He is old. …He wants to help his wife take care of their adult daughter and grandchildren and make up for their years of loss. He has limited time left to experience family life. …He is well deserving of mercy, and our country will be honored for its leniency." (Exhibit B at 3-4, emphasis supplied)

(b) Service of nearly 27 years fully reflects the seriousness of the offense, and satisfies the need to provide just punishment and to afford adequate deterrence, particularly because of his minor role and, as discussed above, the fact that were he to be sentenced today, Mr. Saleh would receive no more than 20 years.

(c) Being nearly 65 years old, Mr. Saleh's age places him in the class of prisoners least likely to recidivate. Based on this, the deportation, and the other factors discussed herein, the need to protect the public from further crimes is fully addressed.

(d) Consideration of providing needed medical care in the most effective manner suggests release rather than continued incarceration. *This is particularly true at this time when prisoners are at great risk from the coronavirus. For this reason alone, he should be released.*

24

(e) Given all the facts and circumstances discussed herein, a reduction in sentence is not inconsistent with the need to avoid unwarranted sentencing disparities. As stated in *United States v. Bellamy*, 2019 US Dist. LEXIS 124219 (DMN 2019), at 19, "…any disparity resulting from a reduced sentence is not unwarranted given the special circumstances he faces in prison as a result of his health and age."

(f) Finally, upon consideration of the overall statutory command that all sentences, while sufficient to achieve the objectives identified in subsection (a)(2), are not "greater than necessary," 18 U.S.C. § 3553(a), the sentence of imprisonment in this case should be reduced to time served for extraordinary and compelling reasons. See *United States v. McGraw*, 2019 US Dist. LEXIS 78370 (SDIN 2019) at 16 (stating that based on the defendant's age and health considerations, further incarceration would be greater than necessary.)

## CONCLUSION

For the foregoing reasons, this Court should reduce Mohammed Saleh's sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A.)

Dated: May 12, 2020

Respectfully submitted,

*Kathy Manley*
KATHY MANLEY
Attorney for *Mohammed Saleh*
NDNY Bar Roll No. 105730
26 Dinmore Road
Selkirk, NY 12158
(518) 635-4005 (phone and fax)
Mkathy1296@gmail.com

25