```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA      :         93-cr-181 (LAP)
                              :
                              :
            v.                :         ORDER
                              :
MOHAMMED SALEH,               :
                              :
            Defendant.        :
-------------------------------x
```

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Mohammed Saleh's motion for early release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. no. 1213.) The Government opposed (dkt. no. 1224), Mr. Saleh replied (dkt. no. 1225), and he has written two additional letters, (dkt. nos. 1233, 1234). For the reasons set out below, the motion is denied.

I. **Background**

Following a nine-month jury trial before the Honorable Michael B. Mukasey, Saleh was convicted in October 1995 for his role in a plot to bomb bridges and tunnels in New York City. For his role in the offense, Judge Mukasey sentenced Saleh to 35 years' imprisonment. During the trial, the Government offered substantial proof of Saleh's participation in the conspiracy. Saleh's role was to provide hundreds of gallons of gas from gas stations that he owned as well as storage space for the gas. But before he did so, Government recordings revealed that Saleh

1

agreed to participate in the bombing plot and supported the cause of jihad. For example, on June 4, 1993, Saleh had at his home for dinner one of his coconspirators and a Government cooperating witness who recorded the conversation. See United States v. Rahman, 189 F.3d 88, 110 (2d Cir. 1999). During the dinner, Saleh repeatedly touted his involvement with the "young men" of Hamas, confirming his enthusiasm for jihad. GX 333T; Tr. 5610-11, 6881.[1] For example, Saleh related the experience of three "young men" whom he knew:

> They were in the army. They had a pledge, read the Quran together [.]. . . They took their weapons, and they had their purchased bombs and such things. They conducted a highly respectable operation. There was an Israeli bus which was collecting the guards, it used to stop daily in a certain point they monitored, so they kept an eye on it, every day[.]. . . They waited until the bus was full, at the point of gathering, they ambushed the bus and finished them. . . .

GX 333T at 16. Although the three had been "martyred," Saleh recalled that the "highly respectable operation" had netted "42 killed, and seven wounded" Israeli soldiers. Id.

---

[1] The Court relies on citations in prior opinions in this case, see United States v. Rahman, 189 F.3d 88 (2d Cir. 1999) (resolving Saleh's and his co-defendants' appeals of their convictions at trial); Elgabrowny v. United States, 2003 WL 22416167, at *9-10 (S.D.N.Y. Oct. 22, 2003) (Mukasey, J.) (denying Saleh's initial Section 2255 petition); see also United States v. Saleh, 03-2820 (2d Cir. July 6, 2004) (affirming the denial of Saleh's initial Section 2255 petition); Saleh v. Holder (D. Colo. Oct. 28, 2010) (denying Saleh's motion for relief pursuant to 28 U.S.C. § 2241), and in the Government's response on this motion.

Later at the same dinner, the co-conspirators explained the bombing plan to Saleh, noting the different targets on a piece of paper. Rahman, 189 F.3d at 110. At one point, Saleh asked, "Are these jihad subjects for here or for Egypt[?]." A co-conspirator answered that the "projects" were "here" (i.e., in the United States) and were "military." GX 333T at 21-22. Saleh agreed to help purchase military equipment. See Rahman, 189 F.3d at 110. Once the co-conspirator felt that Saleh understood the plan, the co-conspirator instructed the cooperating witness to eat the piece of paper, ensuring there would be no record. Id. The cooperating witness did so. GX 333T at 52-53; Tr. 5614-17.

On June 22, 1993, after buying five 55-gallon steel barrels from a Newark drum business, co-conspirators went to Saleh's gas station to get fuel for the bombs. Id. Saleh agreed over the phone to provide the fuel. Id. Saleh's employee filled two of the drums with $140 worth of diesel fuel. Saleh agreed to keep two of the empty barrels in his garage. Id. The co-conspirators did not pay for the fuel, but the employee made out a receipt on which he recorded the license plate of the van. To disguise their conduct, one of the co-conspirators wrote a phony signature on the receipt. Id.

The next day, June 23, 1993, a co-conspirator returned to Saleh's gas station to fill the remaining three 55-gallon drums with diesel fuel. Id. The co-conspirator met Saleh who called

3

his employee at another gas station owned by Saleh to tell him to wait for the two so that they could get fuel before the station closed. Id. When one employee wrote out a receipt, the co-conspirator objected and called Saleh who then told the employee not to put the license number on the receipt but just to write "Sudanese." Id. The employee provided $151 worth of fuel. Id.

On June 24, 1993, a few hours before arrests were made at the safe house used by the members of the conspiracy, FBI agents arrested Saleh at his apartment in Yonkers. Id. At FBI headquarters, Saleh denied having sold fuel to the men. Id. About a week later, on July 5, 1993, Saleh called one of his employees from prison and instructed him to tell another employee to destroy the two receipts documenting the fuel given to his co-conspirators. Id. Saleh said that it would be "dangerous" if the employees failed to follow these instructions. Id.

On October 1, 1995, the jury returned a guilty verdict, convicting Saleh of (i) seditious conspiracy to wage war against the United States and forcibly to oppose its authority, in violation of Title 18, United States Code, Section 2384; (ii) bombing conspiracy, in violation of Title 18, United States Code, Sections 371 and 844; (iii) attempted bombing, in violation of Title 18, United States Code, Sections 844(i) and

4

2; and (iv) aiding and abetting the use and carrying of destructive devices during and in relation to a bombing conspiracy, in violation of Title 18, United States Code, Sections 924(c) and 2.

On January 17, 1996, following a multi-day sentencing proceeding, Judge Mukasey imposed sentence on Saleh and the other defendants who went to trial. The Court first calculated Saleh's United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G") range, finding a base offense level of 43. Judge Mukasey then applied a three-level downward adjustment for uncompleted conspiracies and added a two-level enhancement for obstruction of justice, citing Saleh's attempt to destroy evidence. The judge rejected Saleh's application for a minimal role reduction. Following these calculations, Judge Mukasey found the applicable Guidelines range to be 30 years (360 months) to life imprisonment. About the defendant's conduct, the Court stated at sentencing:

> [T]here is ample evidence in this record that the jury's verdict was correct. There was a tape recording of a conversation on June 4, 1993, a highly specific conversation about bombing tunnels between states in which Mr. Saleh was asked to help and agreed to help. The evidence shows that at a later date he did help by providing diesel fuel. It shows that on the night of his arrest he was well aware of what it was that he was being arrested for, and his conduct and his false statements that night all indicate his guilty knowledge. As I indicated before, his attempt to destroy evidence warrants a 2-point enhancement for obstruction, as did his testimony at the hearing in which he testified to a

5

>     conversation that plainly on the other evidence in the
>     case never happened, in addition to accounting for his
>     behavior on the night of his arrest in ways that are
>     simply incredible.

Sentencing Tr. 49-51.

Ultimately, the Court sentenced Saleh to 35 years imprisonment, above the bottom of the Guidelines range. In imposing sentence, the Court justified its length, saying "I sentenced on the high side because the conduct involved here was of a high degree of seriousness and threatened a huge disaster. I believe that [the imposed] sentence is amply justified." Id. at 51-52.

On August 16, 1999, the Court of Appeals affirmed Saleh's conviction and sentence. Rahman, 189 F.3d at 110. At present, Saleh remains incarcerated at FCI Beckley in rural West Virginia.

## II. Prior Application

On May 12, 2020, the Defendant moved for early release citing changes in sentencing law, the COVID-19 pandemic, and his rehabilitation. Dkt. 1161. The Government opposed. Dkt. 1163.

On July 8, 2020, at the height of the pandemic, the Honorable William H. Pauley III denied Saleh's motion for a sentence reduction in a written opinion. See Saleh, 2020 WL 3839626 at *1. Judge Pauley first considered the "threshold question" of whether Saleh had presented any extraordinary and

compelling reasons warranting a sentence reduction and concluded that Saleh had not. Id. at *2. While Judge Pauley recognized that the risks from COVID-19, when coupled with medical conditions, can constitute an extraordinary and compelling basis for release, Judge Pauley determined that "Saleh has not demonstrated that his pre-existing medical conditions, combined with his age, rise to [that] level." Id. at *3. Judge Pauley carefully parsed Saleh's medical records, considering each of his ailments separately and in combination, noting that only obesity would "plac[e] Saleh at a higher risk of severe illness from COVID-19." Id. Judge Pauley also noted that, at the time of Saleh's application, there were no reported cases of COVID-19 at FCI Beckley where Saleh is housed. Id. In addition, Judge Pauley rejected Saleh's argument that Saleh would have received a different sentence if sentenced today, explaining: "Even prior to Booker, Judge Mukasey was entitled to sentence Saleh to 30 years of imprisonment, the bottom end of the Guidelines range. Instead, he opted to sentence him to 35 years." Id. at *4. Saleh was, according to Judge Pauley, simply "attempting to relitigate his case and dodge procedural requirements." Id.

Judge Pauley separately determined that even if Saleh had established extraordinary and compelling reasons "meriting consideration for compassionate release," the District Court "must also consider[] the factors set forth in section 3553(a)."

7

Id. at *5 (alteration in original). Judge Pauley held that the "§ 3553(a) factors weigh against granting Saleh's application." Id. He explained that "[a]lthough Saleh has served nearly 27 years of his sentence, he joined a terrorist conspiracy whose objective was the indiscriminate killing of Americans in the name of jihad." Id. Judge Pauley also considered that Saleh's "co-conspirators who went to trial and were convicted of seditious conspiracy received similar sentences." Id. Finally, Judge Pauley concluded, "While this Court is cognizant of Saleh's need for medical care, that need alone is insufficient to warrant compassionate release, especially given the severity of his criminal conduct." Id.

The Defendant appealed, and the Second Circuit affirmed Judge Pauley's ruling. See United States v. Elgabrowny, No. 20-2254, 2022 WL 1701515 (2d Cir. 2022) (unpublished).

### III. Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act (Pub. L. 115-391), the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce

> the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)   extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A). The policy statement, which appears at Section 1B1.13 of the Guidelines, provides that a reduction of sentence is permitted if: "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3). The Application Notes of § 1B1.13, in turn, describe multiple ways that a defendant can show "extraordinary and compelling reasons," but only two are relevant here:

> (A) Medical Condition of the Defendant—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

9

>   (ii) The defendant is—
>       (I) suffering from a serious physical or medical condition,
>       (II) suffering from a serious functional or cognitive impairment, or
>       (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant-The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13, Application Note 1.

As the proponent of the motion, Mr. Saleh bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

## IV. **Extraordinary and Compelling Reasons**

On this motion, Saleh repeats the arguments he made to Judge Pauley, including his arguments that he would have received a lower sentence were he sentenced today and that his age, health conditions, COVID-19, and his "extensive rehabilitation" constitute "extraordinary and compelling

10

conditions" warranting release. The Court adheres to the reasoning set out by Judge Pauley in finding that these facts do not constitute extraordinary and compelling conditions within the meaning of the statute.

In his recent letters Saleh notes that he has had knee surgery, requiring him to be assigned a lower bunk, (dkt. no. 1234), and that he has been notified that he will be eligible for home detention as of March 3, 2023, (dkt. no. 1233). Neither fact constitutes an extraordinary and compelling condition warranting release. Saleh's medical needs are being attended to in that he received the required surgery (and is apparently preparing for an additional surgery on that same knee, (dkt. no. 1234), and an early release date (absent an ICE detainer) counsels against earlier release.

The Court finds that this is so even considering the Age of the Defendant provision. Even with the possibility of an additional surgery, Saleh is not "experiencing a serious deterioration in physical or mental health because of the aging process." Rather, he is experiencing the usual aches and pains of a 65-year-old.

### V. Section 3553(a) Factors

Even if Saleh had presented "extraordinary and compelling circumstances warranting release," which he has not, the Section 3553(a) factors counsel against release.

11

As described above in detail, the Defendant joined a terrorist conspiracy whose ends were the bombing and indiscriminate killing of Americans in the name of jihad. He bragged to a co-conspirator about his connections to other terrorists who bombed a bus. As with all terrorists, Saleh's goals were not merely death and destruction but the instillation of fear in the population for political and religious ends. Crimes of terrorism are among the most serious made punishable by the laws of the United States, and so the punishments for such crimes reflect that seriousness.

In analyzing the 3553(a) factors at sentencing, Judge Mukasey determined that a sentence of 35 years was appropriate. With respect to the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense, effect deterrence, and protect the public, see 18 U.S.C. § 3553(a)(1), (2)(A), (2)(B), and 2(C), Judge Mukasey's words have particular salience. As the Court said then, "I sentenced on the high side because the conduct involved here was of a high degree of seriousness and threatened a huge disaster. I believe that [the imposed] sentence is amply justified." Sentencing Tr. at 51-52. That reasoning still applies with full force today.

Judge Pauley's analysis of the same factors led him to find that the Defendant was not eligible for compassionate release.

He wrote, "Here, the § 3553(a) factors weigh against granting Saleh's application. Although Saleh has served nearly 27 years of his sentence, he joined a terrorist conspiracy whose objective was the indiscriminate killing of Americans in the name of jihad." Saleh, 2020 WL 3839626, at *5. The 3553(a) analysis has not materially changed since the case was before Judge Pauley.  Thus, the Court finds that the Section 3553(a) factors weigh against early release.

## VI. Conclusion

For the reasons set out above, Defendant's most recent motion for compassionate release (dkt. no. 1224) is denied.

**SO ORDERED.**

Dated:     New York, New York
           January 10, 2023

_____
LORETTA A. PRESKA
SENIOR UNITED STATES DISTRICT JUDGE